# EXHIBIT "1"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:  10-20526-CIV-MORENO/BROWN**

VALEANT INTERNATIONAL (BARBADOS)
SRL,

Plaintiff,

v.

WATSON PHARMACEUTICALS, INC.,
WATSON LABORATORIES, INC.—FLORIDA,
and WATSON PHARMA, INC.

      Defendants.
_____/

**<u>WATSON DEFENDANTS' CLOSING ARGUMENT</u>**

## TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Claim 3 of the '610 Patent Is Invalid for Anticipation Under 35 U.S.C. § 102 and
        Obviousness Under 35 U.S.C. § 103 ................................................................ 3

        A.     Brief Summary of the Law of Anticipation and Obviousness ............................... 3

        B.     Each Element of Claim 3 of the '610 Patent Is Present in the Mehta '706
               Patent and, Therefore, Is Anticipated .................................................. 4

        C.     Because There Was Ample Motivation in 2004 to Combine the Known
               Elements of Claim 3 of the '610 Patent, Claim 3 Is Obvious ........................... 11

               1.     The stability motivation to pursue bupropion hydrobromide ................. 12

               2.     The commercial motivation to develop bupropion hydrobromide
                      formulations ...................................................................... 15

        D.     The Prior Art Literature as of 2004 Did Not Teach Away from the Use of
               Bupropion Hydrobromide in Pharmaceutical Formulations .............................. 16

               1.     Concerns about bromism did not teach away from using the
                      bupropion hydrobromide salt form ........................................... 17

               2.     The "unpredictability" of salt selection does not teach away from
                      the obviousness of bupropion hydrobromide ................................ 21

               3.     The salt selection literature does not teach away from using
                      hydrobromide salts to address stability ..................................... 22

               4.     The Billinghurst prior art reference does not teach away from using
                      the hydrobromide salt form .................................................... 23

               5.     Bromide's use as a sedative would not have taught away from
                      pairing it with an antidepressant ............................................ 24

               6.     The fact that there were other potential ways to address the
                      stability problem of the hydrochloride salt does not teach away
                      from using an alternate salt .................................................. 24

               7.     Pfizer v. Apotex does not support the proposition that a person of
                      ordinary skill would look outside of the class of hydrogen halides ......... 24

        E.     Valeant's Allegations of Unexpected Results and Other Secondary
               Considerations of Non-Obviousness Cannot and Do Not Overcome Prima
               Facie Obviousness in This Case ............................................................ 25

               1.     Evidence of secondary considerations cannot overcome a strong
                      case of obviousness ............................................................ 25

               2.     Valeant's purported "unexpected" results should not be given
                      weight here because there is no nexus to the asserted claims ............... 26

               3.     Valeant failed to establish any purported "unexpected" result of a
                      decreased seizure risk ......................................................... 27

i

4.      Valeant failed to establish any other purported "unexpected" results ............................................................................................ 27

III.    Valeant's Controlled-Release Formulation Claims—Claims 9 and 10 of the '823 Patent and Claim 2 of the '019 Patent—Are Invalid for Obviousness Under 35 U.S.C. § 103 ............................................................................................ 29

IV.     Claim 1 of the '992 Patent Is Invalid for Anticipation Under 35 U.S.C. § 102 .............. 31

        A.      Bupropion Hydrobromide Synthesized Following the Teachings of the Prior Art Mehta '706 Patent Invariably Results in Form I Claimed in Valeant's '992 Patent and Is Therefore Inherently Anticipated ......................... 31

                1.      The Mehta '706 patent anticipates and teaches how to make bupropion hydrobromide ........................................................ 32

                2.      The Mehta '706 patent qualifies as an anticipatory reference under 35 U.S.C. § 102 .................................................................... 33

                3.      Dr. Adlington faithfully followed the teachings of the Mehta '706 patent to synthesize bupropion hydrobromide ........................................ 34

                4.      Form I inevitably resulted when the prior art was practiced to synthesize bupropion hydrobromide ........................................ 37

        B.      Valeant's Own Documents Show that Dr. Adlington's Synthesis Would Not Affect the Crystalline Form that Was Synthesized by Dr. Adlington .......... 38

V.      Conclusion ...................................................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Chore-Time Equip., Inc. v. Cumberland Corp.,
  713 F.2d 774 (Fed. Cir. 1983)................................................................................6

Cohesive Techs., Inc. v. Waters Corp.,
  543 F.3d 1351 (Fed. Cir. 2008)..............................................................................25

Ecolab, Inc. v. FMC Corp.,
  569 F.3d 1335 (Fed. Cir. 2009), amended on reh'g on other grounds, 366 F. App'x
  154 (Fed. Cir. 2009)................................................................................................3

Ecolochem, Inc. v. S. Cal. Edison Co.,
  227 F.3d 1361 (Fed. Cir. 2000)..............................................................................13

Finisar Corp. v. DirecTV Group, Inc.,
  523 F.3d 1323 (Fed. Cir. 2008)..............................................................................34

Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC,
  618 F.3d 1294 (Fed. Cir. 2010)..............................................................................13

Graham v. John Deere Co.,
  383 U.S. 1 (1966)....................................................................................................25

In re Geisler,
  116 F.3d 1465 (Fed. Cir. 1997)..............................................................................28

In re Gleave,
  560 F.3d 1331 (Fed. Cir. 2009)................................................................................4

In re GPAC Inc.,
  57 F.3d 1573 (Fed. Cir. 1995)..................................................................................8

In re Kao,
  639 F.3d 1057 (Fed. Cir. 2011)..............................................................................26

In re Malagari,
  499 F.2d 1297 (C.C.P.A. 1974) .............................................................................17

In re Samour,
  571 F.2d 559 (C.C.P.A. 1978) ...........................................................................6, 36

Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.,
  367 F.3d 1381 (Fed. Cir. 2004)..............................................................................26

KSR Int'l Co. v. Teleflex, Inc.,
    550 U.S. 398 (2007)..................................................................3, 4, 16

Merck & Co., Inc. v. Teva Pharms.,
    395 F.3d 1364 (Fed. Cir. 2005)...............................................25

NetMoneyIN, Inc. v. VeriSign, Inc.,
    545 F.3d 1359 (Fed. Cir. 2008)...............................................34

Pfizer, Inc. v. Apotex, Inc.,
    480 F.3d 1348 (Fed. Cir. 2007)............................................ passim

Purdue Pharma Prods. L.P. v. Par Pharm., Inc.,
    377 F. App'x 978 (Fed. Cir. 2010) .........................................25

Sanofi-Synthelabo v. Apotex, Inc.,
    492 F. Supp. 2d 353 (S.D.N.Y. 2007)....................................21

Sanofi-Synthelabo v. Apotex, Inc.,
    550 F.3d 1075 (Fed. Cir. 2008)...............................................21

Schering Corp. v. Geneva Pharms.,
    339 F.3d 1373 (Fed. Cir. 2003)................................................3

SmithKline Beecham Corp. v. Apotex Corp.,
    403 F.3d 1331 (Fed. Cir. 2005), reh'g en banc denied .........33

Sundance, Inc. v. DeMonte Fabricating, Ltd.,
    550 F.3d 1356 (Fed. Cir. 2008)...............................................11

**STATUTES**

35 U.S.C. § 102.................................................................... passim

35 U.S.C. § 103.................................................................3, 4, 16, 29

**RULES**

Fed. R. Civ. P. 26(a)(2)(B)(i)....................................................37

Fed. R. Civ. P. 801(d)(2)(C), (D)..............................................11

Fed. R. Civ. P. 803(8)(C)...........................................................11

Fed. R. Civ. P. 30(b)(6)........................................8, 25, 28, 31

I.      INTRODUCTION

At trial, Watson proved through clear and convincing evidence that Valeant's five asserted patent claims are invalid—the work of pharmaceutical formulators applying well-known techniques, not the work of inventors.

Valeant did not invent bupropion hydrobromide.  Valeant did not discover that bupropion hydrobromide was effective to treat depression.  Nor did Valeant invent once-daily dosing of bupropion to treat depression.  To the contrary, bupropion hydrobromide was first disclosed <u>over 35 years ago</u> in Dr. Nariman Mehta's original bupropion patent:  the Mehta '706 patent.  Claim 5 of the Mehta '706 patent covers hydrogen halide acid addition salts of bupropion, a four-member class that includes bupropion hydrobromide.  The Mehta '706 patent discloses that these salts of bupropion are useful for treating depression.  Valeant's experts agreed that claim 5 discloses bupropion hydrobromide.  In fact, Valeant's expert Dr. McBride conceded that of that four-member hydrogen halide class, only two are pharmaceutically-acceptable salts:  bupropion hydrochloride (which is the previously commercialized bupropion salt) and bupropion hydrobromide.

In a case where the prior art did not clearly disclose the specific salt, <u>i.e.</u>, amlodipine besylate, the Federal Circuit found the clear and convincing standard for patent invalidity to be "easily satisfie[d]."  <u>Pfizer, Inc. v. Apotex, Inc.</u>, 480 F.3d 1348, 1361 (Fed. Cir. 2007).  <u>Pfizer v. Apotex</u> involved selection of a salt from a group of 53 known pharmaceutically-acceptable salts.  The facts of the present case are much stronger.  Bupropion hydrobromide is one of only two pharmaceutically-acceptable hydrogen halide salts disclosed in the Mehta '706 patent to be useful in treating depression.

Valeant argues that that it would not have been obvious to use the hydrobromide salt despite:  (1) its disclosure in the Mehta '706 patent; (2) the fact that hydrobromide is the second

or third most common salt used in other FDA-approved products; (3) the known stability problems with the hydrochloride salt; and (4) the specific teachings in the literature about using hydrobromide salts to address stability problems.  Valeant's arguments are the same as those rejected in Pfizer v. Apotex, and they should be rejected here.

Any doubt about the obviousness of using bupropion hydrobromide in a once-daily dosage form to treat depression is resolved by two independent, blinded selections of bupropion hydrobromide by scientists outside of Valeant.  Watson's salt selection expert Dr. Buckton opined on a blinded basis (i.e., without any knowledge that bupropion hydrobromide was the target) that bupropion hydrobromide would have been on his short list of salts to test with a reasonable expectation of success in addressing known stability problems of bupropion hydrochloride extended-release dosage forms.  Dr. Buckton's blinded selection of bupropion hydrobromide is confirmed by the fact that Valeant also blinded its commercial partner, Chemi S.p.A., which arrived at the same conclusion:  Chemi put bupropion hydrobromide on its own short list of salts to pursue.

The claims of Valeant's two controlled-release patents, the '823 and '019 patents, claim well-known controlled-release technologies and do not add anything novel or non-obvious.

This leaves Valeant's '992 polymorph patent.  Watson provided testing that shows that synthesis of the bupropion hydrobromide disclosed in claim 5 of the Mehta '706 patent inevitably results in the creation of the claimed Form I polymorph.  Valeant did not challenge the results of this testing and did not provide any testing of its own to prove that the Mehta synthesis does not result in Form I—and surely it would have if it could have.  The clear, convincing, and completely unrebutted evidence establishes that the '992 patent is inherently anticipated by the Mehta '706 patent.

The patent system exists to reward inventors for disclosing <u>inventions</u> to the public to advance the state of human knowledge.  It does not exist to provide companies with decades of exclusivity on obvious optimizations of long-existing products.  Precedent established by the Supreme Court and the Federal Circuit fully support rejection of Valeant's patent claims.  <u>See</u> <u>KSR Int'l Co. v. Teleflex, Inc.</u>, 550 U.S. 398, 418 (2007); <u>Pfizer v. Apotex</u>, 480 F.3d at 1372. This Court should hold the asserted claims invalid.

## II.   CLAIM 3 OF THE '610 PATENT IS INVALID FOR ANTICIPATION UNDER 35 U.S.C. § 102 AND OBVIOUSNESS UNDER 35 U.S.C. § 103.

Valeant did not discover a new drug, nor a new salt of an existing drug, nor a new use for a known drug.  Bupropion hydrobromide was disclosed more than 35 years ago for treating depression.  The Mehta '706 patent was filed in 1969[1] and issued as a patent in 1974.  (D.E. #135.)

### A.   Brief Summary of the Law of Anticipation and Obviousness.

This Court has the authority to invalidate improperly-issued patents.  <u>Pfizer v. Apotex</u>, 480 F.3d at 1359 ("Our case law consistently provides that a court is never bound by an examiner's finding in an ex parte patent application proceeding.") (citation omitted).

A patent claim is anticipated, and therefore invalid, under 35 U.S.C. § 102 if a single prior art reference—here the Mehta '706 patent—discloses each and every claim limitation by either explicitly listing or inherently disclosing each and every claim limitation.  <u>Ecolab, Inc. v. FMC Corp.</u>, 569 F.3d 1335, 1345 (Fed. Cir. 2009), <u>amended on reh'g on other grounds</u>, 366 F. App'x 154 (Fed. Cir. 2009); <u>Schering Corp. v. Geneva Pharms.</u>, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  And a reference disclosing a genus or class anticipates a species (<u>i.e.</u>, a member of the

---

[1]   The underlying application to which the Mehta '706 patent claims priority is an application filed in Great Britain in 1969.  (D.E. #135.)

3

class) if the disclosure of the genus causes one of ordinary skill in the art to "at once envisage" the particular species. In re Gleave, 560 F.3d 1331, 1338 (Fed. Cir. 2009).

A patent claim is invalid for obviousness under 35 U.S.C. § 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. A "product not of innovation but of ordinary skill and common sense" is obvious. KSR, 550 U.S. at 421. Obviousness results where an examination of the patent claims in light of the prior art and common knowledge at the time shows that the claimed invention was "'the work of a skilled [artisan], not of an inventor.'" Pfizer v. Apotex, 480 F.3d at 1368 (quoting DyStar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d 1356, 1371 (Fed. Cir. 2006)).

**B.     Each Element of Claim 3 of the '610 Patent Is Present in the Mehta '706 Patent and, Therefore, Is Anticipated.**

It is an understatement to say there is nothing new in claim 3 of Valeant's '610 patent. All of its elements were disclosed in the Mehta '706 patent.

The elements of claim 3 are:

1.      [A method of treating depression, comprising administering an effective amount of bupropion hydrobromide to a treat depression to a subject in need thereof][2]

2.      Wherein said method comprises administration of a once-daily dosage

3.      Of bupropion hydrobromide.

**Use of effective amounts of bupropion salts to treat depression:** The Mehta '706 patent disclosed that bupropion was "useful in the treatment of mammals suffering from a

_____

[2] Claim 3 of the '610 patent is a dependent claim which incorporates by reference the elements of claim 1 of the '610 patent. The bracketed language is claim 1.

4

depressed state." (D.E. #135 at col.1 ll.16-17.)  Mehta also clearly teaches that its pharmaceutically-acceptable salts of bupropion can be used to treat depression by administration of an effective amount.  (D.E. #135 at col.3 ll.1-6.)  Other references subsequent to Mehta also teach the administration of effective amounts of bupropion to treat depression.  (See, e.g., D.E. #139 (Young '973 patent) at col.4 l.59-col.5 l.8; D.E. #141 (Fang '328 patent) at col.3 ll.23-29, col.4 ll.5-13; D.E. #144 (Wellbutrin SR® label) at WATSON-BUP00021126; D.E. #146 (Wellbutrin XL® label) at WATSON-BUP00021160;  D.E. #147 (Wellbutrin® label) at WATSON-BUP00021189; D.E. #175 (Maxwell) at WATSON-BUP00020781-82.)  There can be no dispute that this claim element is known from the prior art.

**Once-daily dosing of bupropion:**  The Mehta '706 patent further teaches once-daily dosing of bupropion.  It teaches that the dose of bupropion can be varied according to patient needs, stating that bupropion and its salts are "preferably administered four times daily although the number of daily administrations of the medication may vary according to the patient (mammal) being treated, and the exercise of the physician's discretion."  (D.E. #135 at col.3 ll.31-35.)   Mehta does not explicitly state that once-daily dosing is preferred, but it teaches a small genus of dosing options well known to physicians in 2004:  one, two, three and four doses per day.  A person of skill in the art would have needed to look no further than Wellbutrin® formulations to find dosing at once, twice, and three times a day.  (D.E. #147 (Wellbutrin® label) at WATSON-BUP00021189 (prescribing dosing at two and three times a day); D.E. #144 (Wellbutrin SR® label) at WATSON-BUP00021126 (prescribing dosing at one or two times a day); D.E. #146 (Wellbutrin XL® label) at WATSON-BUP00021160 (prescribing once-daily dosing).)  Thus, once-daily dosing would immediately have been envisaged by a person of ordinary skill in the art in 2004 reading the Mehta '706 patent.

5

And other prior art references make clear that once-daily dosing of bupropion was known in 2004. (D.E. #144 (Wellbutrin SR® label) at WATSON-BUP00021126 (stating that dosing should begin at 150 mg/day given as a single dose); D.E. #146 (Wellbutrin XL® label) at WATSON-BUP00021160 (prescribing once-daily dosing)); see also In re Samour, 571 F.2d 559, 563 n.7 (C.C.P.A. 1978) ("'Every patent application and reference relies to some extent upon knowledge of persons skilled in the art to complement that disclosed. . . . where it might reasonably be doubted that a reference . . . satisfies § 102 . . . other references can be cited as evidence of the level of skill in the art.'") (citation omitted).

Valeant argues that the Mehta '706 patent does not explicitly disclose once-daily dosing,[3] and Watson has never contended otherwise. But Valeant does not and cannot dispute that once-daily dosing of bupropion was well known in the prior art by 2004, and that bupropion hydrochloride was available in once-daily tablets. (Trial Tr. 382:5-23; Chan Dep. 65:6-13, 67:13-68:10, 68:19-70:8, 91:11-92:6, 146:8-147:6, 159:21-160:17.)

**Bupropion hydrobromide:** Given that there is no dispute that bupropion was known to treat depression and that once-daily dosing of bupropion was well-known, the remaining question is whether the prior art taught the hydrobromide salt of bupropion. The Mehta '706 patent specifically disclosed bupropion hydrobromide.

---

[3] Valeant claims that Watson failed to preserve this argument—despite repeated disclosures—because Dr. Buckton, a blinded expert who is not a lawyer, stated at deposition that he viewed the argument on claim 3 to be obviousness instead of anticipation. But Valeant failed to elicit testimony on this point from Dr. Buckton on cross-examination, and there is no requirement that Watson provide expert testimony where a reference clearly anticipates a claim. See Chore-Time Equip., Inc. v. Cumberland Corp., 713 F.2d 774, 779 (Fed. Cir. 1983) ("It is undisputed that the district court had before it all of the relevant prior patented art. The subject matter, i.e., the scope and content, of those patents being easily discernible from their drawings and written descriptions, no testimony, expert or otherwise, regarding their scope and content was necessary.")

Claim 5 of the Mehta '706 patent claims hydrogen halide acid addition salts of bupropion.  This is a four member class and includes bupropion hydrobromide.  (D.E. #135 at col.6 ll.4-15; <u>see also</u> D.E. #132 at WATSON-BUP00020536 (Table 1).)  Considering that Valeant sought an alternate salt form of bupropion, the Mehta '706 patent alone pointed directly to the obvious salt form Valeant chose, bupropion hydrobromide.  Valeant did not discover it. And Mehta even teaches the use of bupropion hydrobromide to treat depression through its disclosure of the use of pharmaceutically-acceptable salts of bupropion to treat depression.  (D.E. #135 at col.3 ll.1-7.)

Valeant does not even argue that bupropion hydrobromide was missing from the prior art. In fact, Valeant has conceded that bupropion hydrobromide <u>was</u> disclosed in Mehta and other prior art references.

Valeant's experts admit that hydrobromide is a hydrogen halide acid addition salt of bupropion and thus disclosed in the Mehta '706 patent.  Valeant's expert Dr. McBride testified that a person of skill in the art reading claim 5 of the Mehta '706 patent as it applied to pharmaceutical formulations would know that, as a practical matter, it encompassed only two salts—the hydrochloride and hydrobromide salts of bupropion:

> Q:    Now, are you aware of how many hydrogen halide acid salts are used in pharmaceutical formulations?
>
> A:    The only ones that I know to be used in pharmaceutical formulations . . . is [sic] the hydrochloride and the hydrobromide.

(Trial Tr. 640:22-641:1.)

Multiple other prior art references also expressly disclose bupropion hydrobromide, including references disclosing it as a "particularly preferred" salt form of bupropion:

- The Young '973 patent, issued in 2000, discloses the use of bupropion to treat depression and discloses that the hydrobromide salt form of an optical isomer of bupropion is "[p]articularly preferred" (D.E. #139 at col.1 ll.10-12, col.1 ll.43-62, col.8 ll.45-55);

- The Fang '328 patent, issued in 2002, discloses the use of bupropion to treat depression, and that the hydrobromide salt of bupropion metabolites are "[p]articularly preferred" (D.E. #141 at col.1 ll.12-14, col.1 ll.20-25, col.6 ll.26-44); and

- The Glick '109 publication, published in 2002, specifically discloses bupropion hydrochloride and bupropion hydrobromide as two examples of suitable pharmaceutically acceptable salts (D.E. #133 at ¶ 25).

Valeant's expert Dr. Anderson acknowledged that a skilled artisan engaging in salt selection would first consider salts that were "preferred" in the prior art.[4]  (Trial Tr. 461:18-22.)  Here, multiple references disclose preferences for bupropion hydrobromide, starting with Mehta's narrow claim to hydrogen halide salts of bupropion, and other references that bupropion hydrobromide was <u>particularly</u> preferred.

The testimony from Watson's salt selection expert, Dr. Buckton, that the Mehta '706 patent and these other prior art references teach the use of bupropion hydrobromide stands unrebutted.  Valeant asked no questions of Dr. Buckton about his opinions on these references on cross-examination, and no Valeant witness contradicted his opinion.

Further, Valeant's former Director of Patents designated by Valeant to provide Rule 30(b)(6) testimony regarding the <u>prior art</u> in this case, Ted Chan, confirmed that the Mehta '706 patent, the Young '973 patent, the Fang '328 patent, and the Glick '109 publication all are prior art references that specifically disclose bupropion hydrobromide.  (Chan Dep. 28:2-3, 28:9-29:6

---

[4]  A person of ordinary skill in the art is presumed to know of all relevant prior art.  <u>See</u> <u>In re GPAC Inc.</u>, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

(Mehta '706 patent), 23:10-11, 24:8-11 (Young '973 patent), 26:19-22, 27:2-21 (Fang '328 patent), 25:5-7, 25:12-16, 26:3-15 (Glick '109 publication).)  His testimony as to each follows:

The Mehta '706 patent

> Q:    If you could please turn to claim 5 of [the Mehta '706] patent.  Is hydrobromide a hydrogen halide acid addition salt?
>
> A:    It is my understanding that yes.
>
> Q:    And this patent generally discloses bupropion, correct? . . . .
>
> A:    Although it doesn't say bupropion, it is my understanding that it is a patent that claims bupropion.
>
> Q:    Since [the] hydrobromide salt is a hydrogen halide addition salt, is it your understanding that claim 5 claims bupropion hydrobromide? . . .
>
> A:    That's my personal understanding.

(Chan Dep. 28:2-3, 28:9-29:6.)

The Young '973 patent

> Q:    So [the Young '973 patent] does show that there is a hydrobromide salt of bupropion that is disclosed?
>
> A:    It appears so as it reads.

(Chan Dep. 23:10-11, 24:8-11.)

The Glick '109 publication

Q:      Does [the Glick '109 publication] expressly disclose the
        hydrobromide salt of bupropion? . . .

A:      Again, just by reading it, it appears that the hydrobromide
        salt is disclosed.

Q:      The hydrobromide salt of bupropion, correct?

A:      I am reading hydrobromide just as it was state[d] here.

(Chan Dep. 25:5-7, 25:12-16, 26:3-15.)

The Fang '328 patent

Q:      If you could please look at column 6 of [the Fang patent],
        particularly lines 22 through 45.  Does this publication
        expressly disclose the hydrobromide salt of bupropion? . . .

A:      Again, as I read it, it reads "Preferred anions are
        hydrobromide, hydrochloride," et cetera.

Q:      And [the Fang] patent indicates that hydrobromide ions are
        particularly preferred, correct?

A:      Correct, as it reads.

Q:      And [the Fang] patent generally is about bupropion,
        correct? . . .

A:      The title of the patent is "Bupropion Metabolites, Methods
        of Use," so it appears so.

(Chan Dep. 26:19-22, 27:2-21.)

Valeant thus admitted—through Mr. Chan's binding 30(b)(6) testimony—that bupropion
hydrobromide was well known in the art years before Valeant developed it.

10

Valeant's attempt to disavow this testimony by arguing that Mr. Chan is not a person of ordinary skill in the art (see D.I. 134) ignores Mr. Chan's role as a 30(b)(6) witness, his qualifications, and the key role Valeant assigned to him in the prosecution of the patents-in-suit.[5] Mr. Chan testified to having "good knowledge" of the prior art, having served as Valeant's Director of Patents who personally prosecuted the patents-in-suit and bound Valeant through his testimony.[6]  (Chan Dep. 21:17-21, 30:11-13, 33:10-39:3.)  He has degrees in both biology and law and has nearly a decade of experience drafting and prosecuting pharmaceutical patents before the PTO.  (Chan Dep. 8:15-9:4, 9:13-25, 14:5-17:13.)  Moreover, Valeant's claim that Mr. Chan is not qualified to describe the scope and content of the prior art in this case rings hollow considering that Valeant certainly felt he was qualified to describe the scope and content of the same prior art when he was advocating for issuance of the patents before the PTO.[7]

Accordingly, because each of the elements of claim 3 of the '610 patent was disclosed in the Mehta '706 patent, claim 3 should be held invalid as anticipated.

### C.   Because There Was Ample Motivation in 2004 to Combine the Known Elements of Claim 3 of the '610 Patent, Claim 3 Is Obvious.

Valeant cannot dispute that the prior art literature discloses each of the elements of claim 3 of the '610 patent.  Valeant therefore must resort to arguing that a person skilled in the art

---

[5]  Notably, the case Valeant cites in support of its position, Sundance, Inc. v. DeMonte Fabricating, Ltd., 550 F.3d 1356 (Fed. Cir. 2008), relates to the designation of a lawyer as an expert to opine on prior art completely unrelated to his field of study, not a 30(b)(6) designee who made arguments on the same prior art before the PTO.

[6]  Valeant also attempts to argue that this testimony is hearsay.  (D.I. 134 at 3.)  Mr. Chan's testimony constituted admissions that Valeant authorized him to make as its 30(b)(6) witness under Fed. R. Civ. P. 801(d)(2)(C), (D).  And all of the prior art he references are excepted from the hearsay rule under Fed. R. Civ. P. 803(8)(C) as records of a public agency.

[7]  The Court has seen that this is only one of the contradictory statements Valeant made to others advocating for its patents before this litigation and arguments Valeant is now making to this Court.  (See Section II.D.1.)

would not have been motivated to simply combine these known elements.  There is ample evidence of motivation to combine the elements of claim 3.

The evidence at trial established two clear motivations for the development of pharmaceutical formulations of bupropion hydrobromide to treat depression:

- The hydrochloride salt was known to be less stable due to hygroscopicity[8] and it was obvious to select an alternate salt to address that problem, specifically bupropion hydrobromide; and,

- The record evidence shows that Valeant was motivated by market forces in 2004 to develop an alternate salt of bupropion in order to maintain its "bupropion franchise."

Both of these reasons for moving to bupropion hydrobromide formulations make claim 3 obvious.

### 1.     The stability motivation to pursue bupropion hydrobromide.

The record contains clear evidence that developing a bupropion hydrobromide salt was an obvious means of addressing the known stability issues of bupropion hydrochloride.

First, there were two <u>blinded</u> and <u>independent</u> selections of bupropion hydrobromide on a short list of obvious salts to try with a reasonable expectation of success by persons <u>other than Valeant</u>.

The first blinded selection was made by Chemi, Valeant's commercial partner.  Valeant's inventor Mr. Maes testified that, after Valeant developed its own short list of promising bupropion salts to try, it asked Chemi to develop a separate list of salts.  (Maes Dep.  65:23-66:10.)  Valeant did <u>not</u> give its list to Chemi.  (Maes Dep. 64:13-66:10.)

---

[8] "Hygroscopicity" is the tendency of a substance to take on water from the atmosphere.  (Trial Tr. 93:3-14.)

Chemi performed literature searches to generate ideas about salts to develop and found a version of the Young '973 patent which discloses bupropion hydrobromide in the form of its (-) optical isomer.  (Maes Dep. Tr. 91:2-93:11; D.E. #109 at BIOVAIL-WAT101691; D.E. #134 at ¶ 0049; D.E. #139 at col.8 ll.45-55.)  After reviewing this literature, Chemi identified bupropion hydrobromide as one of ten salts to pursue.  (Maes  Dep. 86:3-24, 88:15-89:9.)

Chemi's and Valeant's independent simultaneous identification of bupropion hydrobromide points strongly toward a finding of obviousness.  Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC, 618 F.3d 1294, 1305-06 (Fed. Cir. 2010) (finding obvious an independently made, simultaneous invention); Ecolochem, Inc. v. S. Cal. Edison Co., 227 F.3d 1361, 1379-81 (Fed. Cir. 2000) (same).[9]

The second blinded selection of bupropion hydrobromide was made in this case by Watson's salt selection expert Dr. Buckton.  Dr. Buckton testified—without any knowledge of the patents-in-suit nor the fact that the patents claimed bupropion hydrobromide—that persons of ordinary skill in the art in 2004 would have included bupropion hydrobromide on a list of salts to try with a reasonable expectation of success in addressing the stability issues of bupropion hydrochloride.  (Trial Tr. 88:6-89:16; D.E. #602 at 15-20, 26; see also D.E. #200.)  Valeant did not question Dr. Buckton about his blinded methodology.  His blinded selection of bupropion hydrobromide cuts through all of Valeant's arguments against the obviousness of bupropion hydrobromide formulations.  (Trial Tr. 89:6-13; D.E. #602 at 19-20.)

---

[9]   Valeant argues that what the inventors chose to do is irrelevant to the issue of obviousness. (D.I. 131-1 at 2.)  But this argument misses the point.  The issue is not what was subjectively obvious to the inventors of the patents-in-suit, but the fact that both Chemi and Valeant independently and simultaneously arrived at the same result—evidence the Federal Circuit finds probative of obviousness.  This is basic logic:  the more individuals who independently arrive at the same solution, the more clearly obvious that solution is.

13

There were clear teachings in the literature to use hydrobromide salts to address the known stability problems of hydrochloride salts. Dr. Buckton addressed these at length. For one, the Bighley reference provides a decision tree for salt selection that teaches that one should first make the hydrochloride salt, then study its properties as a function of humidity and temperature, and then if there are hygroscopicity issues, one should progress to the development of mineral acid salts (a class to which hydrobromides belong).[10]  In this regard, Bighley plainly states:  "Mineral acids other than hydrochloric, such as sulfuric, phosphoric, and hydrobromic, have been employed principally to reduce hygroscopicity and perhaps the acidity of a resulting solution." (D.E. #166 at WATSONBUP03683080 (emphasis added).)  Instability due to hygroscopicity was precisely the known issue with bupropion hydrochloride.  (D.E. #140 (Kumar '697 patent) at col.5 ll.61-63 ("Bupropion hydrochloride is also very hygroscopic and susceptible to decomposition, thereby presenting stability problems.").)

Furthermore, the motivation to test a hydrobromide as an alternate salt to bupropion hydrochloride is established by the fact that hydrobromides are one of the most commonly used acid salt formers in the pharmaceutical field—an enduring top-three choice as shown by literature from Berge in 1977 to Saal in 2007.[11]  Valeant's own salt selection expert Dr. Anderson was forced to concede during his testimony for Pfizer in the Pfizer v. Apotex case that it was "logical to sic your phalanx of zealous scientists on that [Berge] list and then come up

---

[10] Valeant maintains that Bighley has a decision tree that ultimately leads to testing an organic acid (rather than an inorganic acid such as hydrobromide).  (D.I. 130-1 at 2.)  But to get to this conclusion, Valeant skips the important mineral acid testing step that Bighley teaches.  (D.E. #166 at WATSON-BUP03683076.)  There is nothing whatsoever in Bighley that teaches skipping this step and progressing to organic acids.

[11] In contrast, benzene sulphonate (besylate), the obvious salt form in Pfizer v. Apotex, had a frequency of use of 0.25%, or ranked 27th among the top salt forms.  See id.; (see also D.E. #132 at WATSONBUP-00020536.)

with a product").[12]  480 F.3d at 1363.  From that, the Federal Circuit concluded that "irrefutable evidence shows that a skilled chemist at the time would simply make known pharmaceutically-acceptable salts of whatever active ingredient with which he was working at the time."  Id. at 1362.  Testimony in this case shows that it was even more logical by 2004 to try all the salts on the Berge list when looking for alternate salt because high-throughput screening allowed all such salts to be tested at once.  (Trial Tr. 100:11-16; D.E. #602 at 23.)

Watson's expert Dr. Buckton testified at trial that it was logical to make a bupropion hydrobromide formulation as recited in claim 3 of the '610 patent.  (Trial Tr. 126:1-16.)  Of course, when one made a bupropion salt formulation, one would use it to treat depression, the primary indication of bupropion therapy, and one would have a once-daily administration in mind, as was well-known from Wellbutrin XL®.  Dr. Buckton's testimony on this point was not contested.

### 2.    The commercial motivation to develop bupropion hydrobromide formulations.

But an even more fundamental and relevant motivation existed for Valeant to move to bupropion hydrobromide formulations in 2004:  money.  Testimony establishes Valeant's fundamental motivation for making bupropion hydrobromide was the end of Wellbutrin XL®'s patent exclusivity and its fear that its commercial bupropion partner GlaxoSmithKline ("GSK") was on the brink of terminating its bupropion contract with Valeant.  (Maes Dep. 49:22-50:2.) ("As [Valeant], we wanted to protect our franchise with or without GSK.  Therefore, we needed to have some evolution, improvement, further improvement, name it, many things on the actual

---

[12]   Valeant's expert Dr. Anderson testified in the Pfizer v. Apotex case that the article by Berge was a "classic" article on salt selection, and that it would be advantageous to test previously used anions disclosed in Berge because "[o]ne would at least know that the anion had been sufficiently nontoxic, [since] it had been used [then] to make some salt that was approved." (Trial Tr. 390:12-391:7, 395:12-396:5.)

franchise . . . .")   A 2004 Valeant presentation candidly makes the point, stating that a new salt of bupropion would provide "[n]o treatment benefit but may have IP."  (D.E. #121 at BIOVAIL-WAT361916.)

Knowing its lucrative bupropion franchise was at risk due to patent expiration, Valeant decided to make obvious alternate salt forms and hoped to obtain patents.  (See D.E. #102 at BIOVAIL-WAT098886).  It is clear from this evidence that Valeant was motivated primarily by market forces—not the desire to improve stability—to develop bupropion hydrobromide formulations and preserve its position in the bupropion market.

This is highly relevant to the obviousness of making bupropion hydrobromide formulations.  The United States Supreme Court has made clear that patent claims are obvious where market factors prompt the implementation of a predictable variation.  See KSR, 550 U.S. 398, 417 (2007) ("When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it. . . .  If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.")

That is precisely the situation here—Valeant had a financial motivation to seek to develop formulations using an alternate bupropion salt, and it turned to bupropion hydrobromide—a salt form that was not just obvious, but in fact repeatedly disclosed in over 35 years of bupropion literature and the only other pharmaceutically-acceptable salt claimed in claim 5 of the Mehta '706 patent.

   D.   **The Prior Art Literature as of 2004 Did Not Teach Away from the Use of Bupropion Hydrobromide in Pharmaceutical Formulations.**

Valeant offers a scattershot of "teaching away" arguments—arguments designed to prove that a person of ordinary skill in the art in 2004 would not have chosen bupropion hydrobromide formulations because the literature would have led that person away from bupropion

16

hydrobromide.[13]  As discussed herein, each teaching away argument fails.  Before addressing the failure of these arguments, it is important to reemphasize the strong teachings in the prior art toward using the hydrobromide salt.

- Both Dr. Buckton and Chemi arrived at bupropion hydrobromide on a short list of salts to try to address the stability issues of bupropion hydrochloride, independently of Valeant and unaware that bupropion hydrobromide was the target.  Neither was confused by what the literature taught about hydrobromide salts, neither was deterred by bromism, and neither was led away from developing alternate bupropion salts by Billinghurst.  They considered the literature and were led <u>toward</u> bupropion hydrobromide, not away from it.

- Valeant's teaching away arguments do not address the strong teaching <u>toward</u> an alternate salt of bupropion due to the market forces of patent expiration and GSK's threat to sever its relationship with Valeant.  The market pushed Valeant to develop a new salt—a proper consideration in the obviousness inquiry as stated by the Supreme Court—and it chose the only other pharmaceutically-acceptable salt in claim 5 of the Mehta '706 patent.

### 1. Concerns about bromism did not teach away from using the bupropion hydrobromide salt form.

Valeant worked to persuade the Court that a person of skill in the art would have been led away from using bupropion hydrobromide due to toxicity concerns—the "bromism" issue.  But its arguments were soundly defeated by Valeant's own presentation to GSK and its own

---

[13]   Valeant's "teaching away" arguments are to no avail in rebutting anticipation.  <u>See</u> <u>In re Malagari</u>, 499 F.2d 1297, 1302 (C.C.P.A. 1974) ("If the rejection under 102 is proper, however, appellant cannot overcome it by showing . . . unexpected results or teaching away in the art, which are relevant only to an obviousness rejection.").

witnesses' trial testimony that the prior art literature teaches there is no risk of bromism with bupropion hydrobromide.

- Valeant admitted the prior art literature teaches that bromism was not a concern even at the highest doses of bupropion hydrobromide.  Dr. Graham Jackson, a named inventor of two of the patents-in-suit, conceded that the "representative" prior art literature teaches that there is no risk of bromism even at the highest dose of bupropion hydrobromide.  (Trial Tr. 362:23-25.) This alone establishes that the literature does not "teach away" from bupropion hydrobromide due to toxicity concerns.

- Valeant's admissions and its representations to the FDA and GSK resolve any question that the literature teaches that bromism was not a concern.  In an October 17, 2006 presentation to GSK, Valeant cited charts showing that the level of bromide exposure with bupropion hydrobromide therapy is well below the range even "possibly toxic[]" and well within the range considered "therapeutic."  (D.E. #101 at BIOVAIL-WAT713972.)  In that same presentation, Valeant also represented that the prior art literature teaches that there is "no risk" of bromism even at the highest dose, even assuming chronic use, and even factoring in overdose.  (D.E. #101 at BIOVAIL-WAT713970-76; see generally Trial Tr. 359:14-362:25.)

Others at Valeant came to the same conclusion.  Dr. Peter Silverstone, Valeant's former Senior Vice President of Medical and Scientific Affairs, sent an email to GSK which stated: "Thus, all of the evidence to date supports the fact that there is no risk of bromism from daily administration of bupropion HBr in doses up to 522 mg."  (Silverstone Dep. 259:12-260:12; D.E. #100 at BIOVAIL-WAT218317.)  Two independent consultants engaged by Valeant also came

to this conclusion after reviewing the prior art literature.  (Silverstone Dep. 260:18-261:12, 261:19-272:4, 263:21-264:22, 268:8-20.)[14]

Further, if bromide toxicity were a real concern, one would expect that Valeant would have had to go to great lengths to convince the FDA that the bromide levels in Aplenzin® were safe.  But Valeant submitted only a "limited safety assessment" to the FDA, containing no data to show the levels of bromide delivered.  (Trial Tr. 363:11-365:24, 366:17-370:8; D.E. #119 at BIOVAIL-WAT023306-07; D.E. #84 at BIOVAIL-WAT023300.)  The FDA raised no question or concern about bromide content in Aplenzin® in response.  (Trial Tr. 370:9-11, 357:4-8; Silverstone Dep. 125:4-8, 125:18-19, 127:14-22, 133:19-25, 137:17-138:20.)

• The enduring popularity of hydrobromide in FDA-approved drugs shows that toxicity was not a concern.  The fact that hydrobromides have endured as one of the top three salt forms approved by the FDA, increasing to the second most common form between 2002-2006, demonstrates that its use was not a concern.  Valeant's expert Dr. Anderson agreed that Berge teaches that (hydro)bromide is the third most common anion used in FDA-approved salts.  (Trial Tr. 397:25-398:14.)  He also agreed that the more recent Saal reference indicated that the number of FDA-approved drugs containing hydrobromide increased from 1992-2006.  (Trial Tr. 399:9-12, 399:17-19, 400:3-9, 400:17-401:3; D.E. #127 at WATSON-BUP03683214.)  Dr. Dajani admitted in his deposition that he "do[es]n't doubt" the Saal article's teaching that the use of (hydro)bromide salts was on an upward trend, and (hydro)bromide salts were among the two

---

[14]  Many others also have testified that bromism was not a concern.  Valeant's expert Dr. Preskorn testified that the amount of bromide in the highest dose of Aplenzin would not be a concern.  (Trial Tr. 555:10-558:10, 558:14-559:10.)  Valeant's third-party marketing partners, sanofi-aventis and inVentiv, also testified that they were not concerned about bromism.  (Melloy Dep. Tr. at 358:13-17, 359:17-362:24; Birtchet Dep. Tr. at 54:10-55:14, 202:23-205:15.)  Valeant attempts to argue that GSK was concerned about bromism, but presented no non-hearsay testimony to support this argument.  As such, it should be excluded.

19

most common salts approved by the FDA from 2002-2006.  (Dajani Dep. 124:18-25, 125:17-129:7, 130:2-131:24, 134:17-21.)  Considering that persons of ordinary skill use these lists to determine which salt formers to use (see Section II.C.1. above) there is no legitimate argument that a person of ordinary skill would have been taught away from their use.[15]

Indeed, Valeant's expert Dr. Anderson holds his own patents listing hydrobromide on short lists of pharmaceutically-acceptable salts.  (Trial Tr. 423:9-12, 424:9-425:4, 425:7-426:2.)  Even Valeant's expert in toxicology, Dr. Esam Dajani, also is listed as an inventor on patents disclosing (hydro)bromides on short lists of pharmaceutically-acceptable salts.  (D.I. 139-11 at 3-4 n.16).  This shows hydrobromide to be a commonly-used pharmaceutically-acceptable salt.

Moreover, as discussed above (see Section II.C.1.), both Dr. Buckton and Chemi listed hydrobromide on their shorts lists of salts to use with bupropion.  This is conclusive evidence that persons or ordinary skill in the art would have tried hydrobromide with a reasonable expectation of success.

_____

[15] Valeant cites that a statement in the Stahl literature reference that bromides should be avoided for salt formation in support of its toxicity argument.  (D.I. 136 at 3.)  But this challenge fails.  In the sentence immediately before the "should be avoided" statement, Stahl notes that hydrobromide salts are "still abundant in drug salts."  (P.E. #103 at 138-139; Trial Tr. 86:7-87:2.)  As Dr. Buckton testified, the overall teaching of the literature in 2004, even considering Stahl's minority views, was toward hydrobromides to solve hydrochloride stability problems, not away.  (Trial Tr. 125:1-8.)  In the field of salt selection, concerns about whether a salt form is too toxicologically dangerous are addressed by looking to the list of FDA-approved marketed drugs.  (Trial Tr. 86:7-87:2.)  The lists include one in a 2003 book chapter by Stahl (a year after his "should be avoided" statement), which shows hydrobromide as the third most frequent acid used for salt formation and in which Stahl himself states "[t]he use of such 'inactive' moieties is rather justified by their prior occurrence as salt formers in established drugs, and their further use as safe 'inactive' moiety in drug salts can be largely derived from their presence in marketed drug products."  (D.E. #130 at WATSON-BUP00020594; Trial Tr. 100:23-101:21.)  Indeed, the very book Stahl edited in which his statement appears includes a book chapter entitled "Salt-Selection Strategies" by Serajuddin and Pudipeddi that expressly teaches the use of hydrobromide as part of a pharmaceutical salt selection program.  (P.E. #103 at 148, 151; Trial Tr. 121:15-122:24.)  Even Valeant's inventor Mr. Maes noted that Stahl provides one opinion, but it's "not like the Bible." and others do not agree with him.  (Maes Dep. 87:13-88:2.)  This is confirmed by the Chemi and Buckton selections of bupropion hydrobromide.  (See Section II.C.1. above.)

### 2. The "unpredictability" of salt selection does not teach away from the obviousness of bupropion hydrobromide.

There is no issue of unpredictability in this case because the bupropion hydrobromide salt form that Valeant chose was not new—it was known from the very earliest days of bupropion. But any concern about the predictability of salt selection is resolved by the Federal Circuit's holding in Pfizer v. Apotex.  The Federal Circuit squarely rejected the idea that salt selection was a wholly unpredictable exercise simply because the salts must be made and tested:

> [O]bviousness can not be avoided simply by a showing of some degree of unpredictability. . . . [A] rule of law equating unpredictability to patentability, applied in this case, would mean that any new salt—including those specifically listed in the [prior art patent] itself—would be separately patentable, simply because the formation and properties of each salt must be verified through testing. This cannot be the proper standard since the expectation of success need only be reasonable, not absolute.

Pfizer v. Apotex, 480 F.3d at 1364, 1366.

The unpredictability argument for non-obviousness, unsuccessfully made by Valeant's expert Dr. Anderson when he was Pfizer's expert in Pfizer v. Apotex, should meet the same fate here.  In fact, the Federal Circuit held that "a reasonable fact finder could not accept Dr. Anderson's testimony that the number of acceptable anions was 'unlimited.'"  Id. at 1362.[16]

---

[16] Valeant attempts to direct the Court to a much more abbreviated discussion of salt selection in a manifestly distinguishable case, Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075 (Fed. Cir. 2008), in an attempt to distract from the clearly applicable teachings of Pfizer v. Apotex.  But Sanofi v. Apotex, a case in which the Federal Circuit reviewed the district court's decision for clear error, primarily addresses the obviousness of a salt of a newly-discovered drug, a separated and isolated enantiomer, not a different salt form of an existing drug as in this case and in Pfizer v. Apotex.  Id. at 1082, 1086-90.  In Sanofi v. Apotex, the Federal Circuit heavily weighed the fact that successfully separating and isolating an enantiomer was a difficult task.  Id.  Also distinguishing Sanofi from Pfizer and the present case is the fact the salt form used in Sanofi v. Apotex had no precedent in FDA-approved drug forms, unlike the present case or Pfizer v. Apotex.  See Sanofi-Synthelabo v. Apotex, Inc., 492 F. Supp. 2d 353, 375 (S.D.N.Y. 2007).  Thus, the Federal Circuit's opinion in Pfizer v. Apotex controls in this litigation because it dealt with an analogous fact scenario—the obviousness of a different salt form—rather than the obviousness of a newly-discovered drug and an unapproved salt form as in Sanofi v. Apotex.

21

3.      **The salt selection literature does not teach away from using hydrobromide salts to address stability.**

Valeant claims that the literature regarding the selection of pharmaceutical salts teaches against the use of hydrobromide salts to address issues with stability of hydrochloride salts.  But both Dr. Buckton and Chemi were led to bupropion hydrobromide by the literature.  And Valeant cannot erase the clear words of Bighley that teach that hydrobromides are used to address hygroscopicity-based stability problems of hydrochlorides.  (D.E. #166 at WATSON-BUP03683080.)

Instead, Valeant attempts to confuse the teachings of the Gould reference.  However, Dr. Buckton testified that Gould (D.E. #173) exemplifies the approach of testing a limited number of FDA-approved salts based on known tendencies of each salt form to address particular problems such as stability.  He testified that Gould teaches a three-pronged approach to develop a <u>number</u> of salts to screen including "small counterions," such as bromides, to address stability problems. (Trial Tr. 94:9-97:4; D.E. #173 at WATSON-BUP00020747.)

Valeant did not cross-examine Dr. Buckton's opinion on the Gould reference, yet maintains that none of the strategies for improving stability listed by Gould would include using the hydrobromide.  (D.I. 130-1 at 2.)  But as Dr. Buckton testified, Gould teaches a person of ordinary skill to test a <u>range</u> of salts using counterions that are known to improve stability: carboxylic acids, hydrophobic acids, <u>and</u> small counterions, and he <u>explicitly</u> lists bromide as a small counterion.  (Trial Tr. 94:9-97:4; D.E. #173 at WATSON-BUP00020747.)  Valeant tries to re-write the small counterion option in Gould to say "smaller counterion than the hydrochloride." But there is no teaching in Gould that you need to use a smaller counterion than hydrochloric acid.  (D.E. #173 at WATSON-BUP00020747.)  As Dr. Buckton testified, Gould teaches persons of skill in the art to look for <u>another</u> small counterion salt former (such as hydrobromic acid) that

22

would have the same high melting point stability benefit but would avoid the hygroscopicity problem of the original small counterion (hydrochloric acid).  (Trial Tr. 94:9-97:4.)  Dr. Anderson agreed that Gould teaches that one can use a bromide ion to obtain the advantage of stability conferred by its high melting point.  (Trial Tr. 475:20-476:7.)  This testimony reveals Valeant's criticism to be hollow.

### 4. The Billinghurst prior art reference does not teach away from using the hydrobromide salt form.

Valeant's argument that the Billinghurst prior art reference (D.E. #128) teaches away from using the hydrobromide salt form also fails.  Both Dr. Buckton and Chemi were in possession of the Billinghurst application when they made their blinded selections of bupropion hydrobromide to address stability issues with bupropion hydrochloride.  (D.E. #602 at 16; D.E. #109 at BIOVAIL-WAT101691.)  Neither Dr. Buckton nor Chemi believed this reference taught that mineral acids should be avoided or that alternate salts for bupropion were not worthwhile.

Valeant relies heavily on the Billinghurst application, yet its own expert Dr. Anderson implicitly acknowledged the limited teachings of Billinghurst.  Dr. Anderson could not explain why certain mineral acids[17] (such as hydrobromide) were not tested and why the only mineral acids shown to be tested by Billinghurst were in hydrate form.  (Trial Tr. 479:9-11.)[18]  The fact that a few select mineral acids in hydrate form did not work did not mean that others should not be tried.  And, although bupropion hydrobromide is a mineral acid, it is <u>not</u> a hydrate. Billinghurst provides no evidence that hydrobromide should not be tried and only shows that the <u>hydrate</u> forms of the few mineral acids listed in Billinghurst lacked stability.

---

[17] Mineral acids are inorganic acids and include hydrobromic, hydrochloric, iodic, nitric, phosphoric, and sulfuric acids.

[18] A hydrate is a crystal that contains water as part of its crystal structure.  A hydrate of a mineral acid is a mineral acid that contains water in its crystalline structure.

**5.      Bromide's use as a sedative would not have taught away from pairing
it with an antidepressant.**

Persons of ordinary skill would not have avoided using a hydrobromide salt form because
of bromide's historic use as a sedative.  Valeant's expert Dr. Preskorn admitted that he has
prescribed sedatives to counteract the well-known insomnia side effect of antidepressants.  (Trial
Tr. 559:19-560:23.)  Even the Wellbutrin XL® label states that insomnia side effects can be
managed by administration of a sedative.  (D.E. #146 at WATSON-BUP00021160.)

**6.      The fact that there were other potential ways to address the stability
problem of the hydrochloride salt does not teach away from using an
alternate salt.**

Valeant also argues that stability issues with hydrochloride could have been explored by
other means than changing the salt form.  (D.I. 130-1 at 2.)  The fact that there might have been
different ways to address a particular problem does not equate to a teaching away.  In any event,
Dr. Jackson explained that other attempts to address the stability issues, such as changing the
product packaging or the manufacturing conditions, were unsatisfactory.  (Trial Tr. 302:5-
303:16.)  Dr. Buckton explained that these other techniques are "band-aids" that do not address
the essential stability of the compound—salt selection cures the underlying issue. (Trial Tr.
120:10-23.)  Thus, selection of an alternative salt was the obvious solution to bupropion's
stability issues.

**7.      <u>Pfizer v. Apotex</u> does not support the proposition that a person of
ordinary skill would look outside of the class of hydrogen halides.**

In <u>Pfizer v. Apotex</u>, Pfizer scientists discovered that amlodipine maleate was susceptible
to degradation because a double bond of maleate underwent an addition reaction that caused the
instability.  480 F.3d at 1362.  Under those circumstances, the <u>Pfizer v. Apotex</u> Court noted that
it made sense to seek a salt form without the same double bond, such as benzene sulphonate
(besylate).  <u>Id.</u>  But in the present case, Valeant has presented no evidence that the structure of

24

hydrochloride contributed to instability, or that hydrogen halides as a class resulted in instability. In fact, the evidence is that another member of the class, i.e., hydrobromides, would help with stability. Thus, there is no teaching that one would be directed to a different structure or to a member outside of the class of hydrogen halides to address the stability issue with bupropion hydrochloride.

### E.   Valeant's Allegations of Unexpected Results and Other Secondary Considerations of Non-Obviousness Cannot and Do Not Overcome Prima Facie Obviousness in This Case.

Valeant's major remaining claim against the obviousness of bupropion hydrobromide formulations are that it found "unexpected results." Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966).[19] But Valeant's arguments fail as a matter of law and a matter of fact.[20]

### 1.   Evidence of secondary considerations cannot overcome a strong case of obviousness.

The Federal Circuit stated in Pfizer v. Apotex that secondary considerations of non-obviousness cannot overcome a strong case of obviousness. 480 F.3d at 1372. Thus, if the Court determines that the facts supporting obviousness in the present case are at least at strong as those in Pfizer v. Apotex (in fact, they are much stronger), Valeant's purported secondary

---

[19]  Valeant also makes some claims that evidence that others are seeking to make generic versions of Aplenzin®, and the fact that sanofi licensed Aplenzin®, are secondary considerations of non-obviousness. But evidence of licensing and copying are weak indicators of non-obviousness in this case. Ms. Carro, Valeant's Rule 30(b)(6) witness for marketing, admitted that sanofi never indicated it licensed Aplenzin due to any of Valeant's patented features. (Carro Dep. Tr. 319:23-320:12.) And courts routinely have found that copying is not "compelling" evidence of non-obviousness "in the ANDA context where a showing of bioequivalency is required for FDA approval." See, e.g., Purdue Pharma Prods. L.P. v. Par Pharm., Inc., 377 F. App'x 978, 983 (Fed. Cir. 2010) (unpublished); Merck & Co., Inc. v. Teva Pharms., 395 F.3d 1364, 1377 (Fed. Cir. 2005).

[20]  Secondary considerations of non-obviousness are not relevant to Watson's anticipation claims. See Cohesive Techs., Inc. v. Waters Corp., 543 F.3d 1351, 1364 (Fed. Cir. 2008) ("Moreover, obviousness requires analysis of secondary considerations of nonobviousness, while secondary considerations are not an element of a claim of anticipation.")

considerations, even if credited in full, would be insufficient to overcome the strong prima facie case of obviousness presented here.

> ### 2.    Valeant's purported "unexpected" results should not be given weight here because there is no nexus to the asserted claims.

The Court need not consider the issue of whether the evidence supports the purported "unexpected" results until Valeant proves the "fundamental requirement": the existence of a close nexus between the purported "unexpected" results and the asserted claims.

> [T]here is a more fundamental requirement that must be met before secondary considerations can carry the day. For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention. . . . Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention.

See In re Kao, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (emphasis in original). There is no nexus if an unexpected result relates to an aspect of the claim that is not new. See id.[21]

Valeant alleges five "unexpected" results of bupropion hydrobromide: (1) improved stability; (2) lowered seizure risk associated with bupropion; (3) improved resistance to dose dumping (i.e., the rapid release of drug into the blood stream upon the ingestion of alcohol); (4) a single pill for the largest dose of bupropion hydrobromide (522 mg); and (5) less corrosion of manufacturing equipment. (D.I. 126-1 at 3.) But none of these derives from a novel component

---

[21] Contrary to Valeant's representation in its opening argument, (see Trial Tr. 38:4-20), a nexus absolutely is required to demonstrate unexpected results. The case Valeant cited for the proposition that it is not, Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc., 367 F.3d 1381, 1384-85 (Fed. Cir. 2004), does not state or imply that a nexus is not required. Rather, the Federal Circuit merely explained that the court should consider data showing unexpected results even if that data was obtained after the patent issued. Id.

of an asserted patent claim.  (See Appendix A.)  To the extent they exist, they stem from the non-novel bupropion hydrobromide element.  Thus, there is no nexus as required by law.[22]

### 3. Valeant failed to establish any purported "unexpected" result of a decreased seizure risk.

Valeant cannot demonstrate a reduced risk of seizures.  The human data cited by Dr. Preskorn to support this claim lacked statistical significance and were criticized by Valeant's own employees.  (Trial Tr. 547:15-548:8 (describing a study as "messed up"); 548:9-18, 551:9-552:2 (noting that EEG results relied upon were not predictive or reflective of seizures), 544:1-19, 545:3-10, 545:11-546:5, 547:3-14 (studies were not statistically significant).)

Moreover, the FDA has not allowed Valeant to state that Aplenzin® demonstrates a reduced risk of seizures in humans over bupropion hydrochloride.  (Trial Tr. 541:2-5, 580:9-16.)  The FDA did not deem the human data significant enough to permit mention of it on the Aplenzin® label.  (Trial Tr. 539:2-9, 539:21-541:5; see also D.E. #149 at WATSON-BUP03683110.)  Valeant's marketing partner, sanofi-aventis, also admitted that it never has been able even to market any purported reduced risk of seizures because the FDA would not allow it without acceptable studies in humans showing such a reduction.  (Melloy Dep. Tr. 196:8-197:20, 258:19-262:22, 338:3-344:9.)  There is no evidence that anyone other than Valeant in this litigation deems this data sufficient to support a reduced risk of seizures.

### 4. Valeant failed to establish any other purported "unexpected" results.

With respect to stability, the minimal data Valeant relies on to support this result does not demonstrate that the stability of hydrobromide was unexpected.  The prior art Gould reference teaches that stability problems can result from hydrochloride salts.  (D.E. #173 at WATSON-

---

[22] Valeant previously asserted claims directed to instability and seizures; however, Valeant withdrew those claims.  (D.I. 95.)

BUP00020739-40).  And the prior art teaches that hydrobromide salts are used to address stability issues in hydrochloride salts.  (See, e.g., D.E. #166 (Bighley) at WATSON-BUP03683080.)

Valeant's claim regarding corrosion is no more persuasive.  Valeant has not presented any data showing that there was less corrosion in equipment caused by either the hydrochloride or hydrobromide salt form of the drug itself.  See In re Geisler, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (patentee must offer objective, factual evidence of the unexpected results).

And testimony from its own Rule 30(b)(6) witness, Dr. Jackson, strongly undercuts Valeant's dose-dumping claim.  Dr. Jackson was shown an e-mail from GSK criticizing Valeant's assertion that dose dumping was a concern, concluding that Valeant had not shown that dose dumping was a problem with Wellbutrin®.  (Trial Tr. 381:13-24, 383:22-384:10; D.E. #569 at BIOVAIL-WAT218069.)  Dr. Jackson testified that he had "no reason to disagree" with this conclusion.  (Trial Tr. 381:13-24.)  This shows that there was no dose dumping benefit of bupropion hydrobromide because there was no dose dumping problem with bupropion hydrochloride.

Moreover, the FDA has not allowed Valeant to make a claim to decreased dose dumping on its Aplenzin® label.  Instead, the label contains warnings not to consume alcohol while taking Aplenzin®.  (See D.E. #149 at WATSONBUP-03683104, 3683120-21.)  And neither sanofi nor Ventiv market this purported benefit.  (Melloy Dep. 208:5-209:7; Birtchet Dep. 61:21-64:13, 202:3-22, 230:9-231:12.)  Thus, there simply is no evidence that anyone other than Valeant deems its dose-dumping data sufficient to claim such a benefit.

## III.   VALEANT'S CONTROLLED-RELEASE FORMULATION CLAIMS—CLAIMS 9 AND 10 OF THE '823 PATENT AND CLAIM 2 OF THE '019 PATENT—ARE INVALID FOR OBVIOUSNESS UNDER 35 U.S.C. § 103.

Because it was obvious to treat depression with a once-daily dosage form of bupropion hydrobromide, a once-daily dosage form of bupropion hydrobromide would have been obvious. The claims of Valeant's two controlled-release patents, the '823 and '019 patents, are directed to the use of conventional controlled-release matrix technology to make this obvious dosage form. Controlled-release formulations of pharmaceutical products, including bupropion drugs, have a long history.  The claims of the '823 and '019 patents are simply window dressing designed to obscure that Valeant's real purported point of novelty is bupropion hydrobromide—which has been a known and disclosed salt of bupropion for over 35 years.  The controlled-released aspects of those claims do not add any novelty or non-obviousness to them.

Claims 9 and 10 of the '823 patent are as follows:

**Claim 9**       [A controlled release matrix comprising bupropion hydrobromide dispersed within a matrix][23] wherein said bupropion hydrobromide is present in the controlled release matrix in an amount of from 40% to 90% by weight of the matrix dry weight.

(D.E. #002 at col.204 ll.17-18, 34-37.)

**Claim 10**      [A controlled release matrix comprising bupropion hydrobromide dispersed within a matrix,] wherein said matrix comprises at least one member selected from the group consisting of hydrophobic polymers, hydrophilic polymers, lipophilic materials and mixtures thereof.[24]

(D.E. #002 at col.204 ll.17-18, 35-41.)

_____

[23] Claim 1 of the '823 patent, while not asserted, is an independent claim which is incorporated into asserted dependent claims 9 and 10.

[24]   Hydrophilic and lipophilic polymers have a strong affinity for water or lipids, respectively, and hydrophobic polymers lack an affinity for water.

Dr. Buckton testified that controlled release matrices for pharmaceuticals as claimed in the '823 patent had been known for decades before Valeant filed its patent claims.  (See D.E. #602 at 48-49.)  With respect to claim 9 of the '823 patent, Dr. Buckton explained that Valeant claims nothing unobvious about finding this broad amount range of bupropion in the dosage form.  (See D.E. #602 at 52-53.)  And with respect to claim 10 of the '823 patent, Dr. Buckton testified that one of ordinary skill in the art would understand that a controlled-release matrix could include hydrophobic polymers, hydrophilic polymers, lipophilic materials, and mixtures thereof.  (D.E. #602 at 52-53.)  Moreover, references such as the Fang '328 patent also teach that a controlled-release matrix can include hydrophobic polymers, hydrophilic polymers, lipophilic materials, and mixtures thereof.  (D.E. #141 at col.23 ll.20-40, col.25 ll.18-47, col.25 l.65-col.26 l.22, col.36 l.62-col.37 l.59.)  Each of the elements of these claims were well-known and obvious.

The elements of claim 2 of the '019 similarly claim controlled release formulations well known in the art.  Claim 2 is as follows:

> **Claim 2**      A composition comprising bupropion hydrobromide and at least one controlled polymer that controls the release of the bupropion hydrobromide upon administration to a patient to provide plasma concentrations of the bupropion hydrobromide within a therapeutic range over a 24 hour period.

(D.E. #005 at col.202 ll.1-6.)

Dr. Buckton testified that all of the elements of the '019 patent were well known in the prior art.  He explained that the Li '553 patent discloses a once-daily formulation of bupropion hydrochloride that "provide 24 hour efficacy with once-daily dosing [wherein] therapeutic plasma levels are maintained from 12 to 24 hours."  (D.E. #602 at 59; D.E. #143 at col.4 ll.22-25.)  Moreover, one of ordinary skill in the art would understand that the once-daily formulation

of bupropion hydrochloride embodied in Wellbutrin XL® and the Li '553 patent could be used to make a once-daily formulation of bupropion hydrobromide that would maintain blood plasma levels for a 24 hour period.  (D.E. #602 at 59; see also D.E. #143 at col.4 ll.22-25; D.E. #146 at WATSON-BUP00021160-61.)

But the Court need not rely solely on Dr. Buckton to determine the obviousness of these claim elements.  Valeant's own documents and the testimony of its inventor and Rule 30(b)(6) witness Dr. Jackson confirm that there are no novel elements relating to Valeant's controlled-release formulation claims in claims 9 and 10 of the '823 patent and claim 2 of the '019 patent. (Trial Tr. 372:12-373:4, 373:17-374:8.)

Moreover, the obviousness of the controlled-release elements of the claims is confirmed by the '823 and '019 patents themselves, which expressly teach that "[t]he controlled release matrices of the present invention can be manufactured by methods known in the art . . . ."  (D.E. #002 at WATSON-BUP00786926, col.58 ll.13-16; D.E. #005 at WATSON-BUP00786324, col.58 ll.9-12; Trial Tr. 376:23-377:5.)  In other words, the patents themselves concede that the controlled-release elements of the claims are obvious.  This evidence alone shows that Valeant's formulation claims are invalid for obviousness.

## IV. CLAIM 1 OF THE '992 PATENT IS INVALID FOR ANTICIPATION UNDER 35 U.S.C. § 102.

### A. Bupropion Hydrobromide Synthesized Following the Teachings of the Prior Art Mehta '706 Patent Invariably Results in Form I Claimed in Valeant's '992 Patent and Is Therefore Inherently Anticipated.

Watson's expert synthetic chemist Dr. Robert Adlington synthesized bupropion hydrobromide according to the teachings of the prior art Mehta '706 patent.  His synthesis, coupled with the analysis of Dr. Anthony Michael Glazer, Watson's expert in crystallography, proves that the synthesis of bupropion hydrobromide following the Mehta '706 patent inevitably

results in the crystalline structure (Form I) recited in claim 1 of Valeant's '992 patent.[25]   Valeant concaded that the result of Dr. Adlington's synthesis was Form I.  And Valeant performed no counter-testing to show Form I would not result from making bupropion hydrobromide in accordance with the teachings of Mehta.  As such, claim 1 of Valeant's '992 patent is inherently anticipated and invalid under 35 U.S.C. § 102.

       1.       **The Mehta '706 patent anticipates and teaches how to make bupropion hydrobromide.**

Claim 5 of the Mehta '706 patent claims a class of four compounds, two of which (bupropion hydrobromide and bupropion hydrochloride) are pharmaceutically-acceptable salts. (D.E. #135; Trial Tr. 640:22-641:1.)  The Mehta '706 patent gives clear guidance on how to make the salts of bupropion claimed in claim 5.  Column 1 of the patent states that the compound may be synthesized by a "particularly convenient route . . . set out in the following reaction scheme," which shows the route for synthesizing the free base of bupropion.  (D.E. #135 col.1 ll.49-72.)  In column 4, the Mehta '706 patent states: "The invention will now be illustrated with reference to the following examples."  (D.E. #135 col.4 ll.4-5.)  Only one of the three examples shows the creation of a bupropion salt.  That is Example 1.  (D.E. #135 col.4 ll.6-55.)

Example 1 of the Mehta '706 patent teaches how to make bupropion hydrobromide as claimed in claim 5 of the Mehta '706 patent.  Although hydrochloric acid instead of hydrobromic acid is used during the salt forming step in this example, there are two reasons why a person of skill in the art would use that example to make the bupropion hydrobromide claimed in claim 5.

First, Example 1 is entitled "Preparation of [Bupropion]."  (D.E. #135 col.4 l.7.)  It is not entitled "Preparation of Bupropion Hydrochloride."  This makes clear that this is the illustrative

---

[25]  Claim 1 of the '992 patent claims a crystalline compound having a PXRD pattern shown in Figure 54.  (<u>See</u> Appendix A; DE #001, col.202 ll.26-38 & Fig. 54.)

example for making the bupropion salts of the invention, exemplified for, but not limited to, bupropion hydrochloride.  This would lead a skilled artisan to understand that this synthetic method results in the salts of bupropion disclosed by Mehta.

Second, a person of ordinary skill in the art would have known that hydrochloric acid could be replaced by any of the other three hydrogen halide acid addition salts disclosed in claim 5—including hydrobromic acid.  Dr. Glazer explained that, to practice claim 5 of the Mehta '706 patent, one of ordinary skill would be "well aware that instead of using hydrogen chloride you can use . . . hydrogen bromide. . . . Otherwise, it makes no sense having claim 5 [in the Mehta '706 patent]."  (Trial Tr. 232:5-19.)  Dr. Glazer described this replacement as a "trivial change."  (Trial Tr. 231:11-16.)  Valeant's expert Dr. McBride acknowledged that a person of skill would know to make bupropion hydrobromide using hydrobromic acid following Example 1 of the Mehta '706 patent.  (See Trial Tr. 641:6-21, 646:8-13, 682:16-21.)

### 2. The Mehta '706 patent qualifies as an anticipatory reference under 35 U.S.C. § 102.

Under the doctrine of inherent anticipation, a patent claiming a particular crystalline structure of a compound is inherently anticipated by a prior art reference if the claimed polymorph is "the natural result flowing from" or the "inevitabl[e] result[]" of practicing the prior art process.  SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331,1343-44 (Fed. Cir. 2005), reh'g en banc denied.

The Mehta '706 patent anticipates claim 1 of the '992 patent under 35 U.S.C § 102.  Contrary to Valeant's argument that substituting hydrobromic acid for hydrochloric acid in Example 1 is improper under an anticipation analysis (D.I. 119 at 2), a prior art reference can anticipate if there is a "linkage" between the teachings in the reference that are arranged or

combined in the same way as claimed in the patent that is anticipated. Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1338 (Fed. Cir. 2008).

Here, a person of ordinary skill would have known there was a "linkage" between Example 1 and claim 5 of the Mehta '706 patent—both Dr. Glazer and Valeant's expert Dr. McBride acknowledged this linkage when they testified that one of skill in the art reading claim 5 of the Mehta '706 patent would have known to substitute hydrobromic acid for hydrochloric acid in Example 1 to make Mehta's claimed bupropion hydrobromide salt.[26]  (Trial Tr. 232:5-19; Trial Tr. 641:6-21, 646:8-13, 682:16-21.)  Thus, this substitution was entirely proper under the law of anticipation.

### 3.    Dr. Adlington faithfully followed the teachings of the Mehta '706 patent to synthesize bupropion hydrobromide.

The evidence shows that Dr. Adlington, the only synthetic organic chemist in this case,[27] faithfully followed the teachings of the prior art Mehta '706 patent to synthesize bupropion hydrobromide.  Dr. Adlington testified that he faithfully followed the teachings of the Mehta '706 patent to synthesize bupropion hydrobromide using the methods, scale, and techniques that would have been used by a person of ordinary skill in the art of synthetic organic chemistry as of June 2004.  (Trial Tr. 162:7-9, 177:9-23.)  With respect to making the free base of bupropion, Dr. Adlington testified that he "exactly . . . followed" the reaction scheme for the bupropion free base set forth in column 1 of the Mehta '706 patent, which generally describes the more specific steps exemplified in Example 1.  (Trial Tr. 165:12-166:21.)  To obtain the hydrobromide salt of

---

[26] Notably, the Court found there was not such a linkage in the prior art disclosure at issue in the case cited by Valeant, NetMoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1371 (Fed. Cir. 2008).

[27]  Valeant's expert Dr. McBride is a physical, rather than a synthetic, organic chemist.  (Trial Tr. 637:15-20.)  Dr. McBride admitted that he does not perform chemical synthesis on a day-to-day basis and does not synthesize complicated molecules.  (Trial Tr. 637:21-638:11.)  He never attempted to synthesize or test bupropion hydrobromide himself.  (Trial Tr. 640:1-5.)

bupropion, he used hydrobromic acid in the salt forming step of Example 1 as claim 5 of the Mehta '706 patent teaches.  (D.E. #603 at 4.)  As further taught by the Mehta '706 patent, Dr. Adlington first crystallized bupropion hydrobromide using water as a solvent.  (D.E. #603 at 8-9.)  He kept a sample of the resulting crystals.  (D.E. #603 at 9.)  Dr. Adlington then re-crystallized the bupropion hydrobromide using isopropyl alcohol with ethanol.  (D.E. #603 at 9.)  Dr. Adlington then took a sample of these crystals as well.  (D.E. #603 at 9-10.)

Valeant's efforts to criticize his synthesis fail to show that Dr. Adlington deviated from the steps a person of ordinary skill in 2004 would have followed.

- The scale used for Dr. Adlington's synthesis did not affect the chemistry of the bupropion hydrobromide product he synthesized.  Dr. Adlington explained that changing the scale of the amount of ingredients he used from pilot plant to laboratory scale did not affect the chemistry of the final compound, only the amount of the compound produced (and was the adjustment a person or ordinary skill would know to make when first synthesizing a compound).  (Trial Tr. 167:11-168:17, 169:17-170:7.)  He accurately recalculated this scale after each stage of his synthesis according to the yield his synthesis produced.  (Trial Tr. 160:1-2; 169:17-170:7.)

Dr. McBride testified during cross-examination that certain lots manufactured by Avilive (Watson's bupropion hydrobromide supplier) resulted both Form I and Form II, a problem he misleadingly attributed solely to scale-up.  (Trial Tr. 656:7-12.)  But Avilive did not identify the specific cause of the problem, instead stating that "it could be the material or scaleup procedure or other factors [that] affect the crystalline forms."  (D.E. #475 at WATSON-BUP03670828 (emphasis added).)  Notably, Avilive did not change the scale to solve the problem—it changed the heating system and crystallization process.  (D.E. #475 at WATSON-BUP03670828.)  Moreover, Dr. McBride's testimony about Avilive's process is not probative since he does not

35

know whether Avilive's process is similar to the method taught by the Mehta '706 patent.  (Trial Tr. 658:1-5.)

- The scratching step in Dr. Adlington's synthesis did not affect the chemistry of the bupropion hydrobromide product he synthesized.  Dr. Adlington testified that scratching did not affect the chemistry of his final bupropion hydrobromide product.  (Trial Tr. 173:5-8.)  He explained that he did not employ the traditional method of scratching by using a glass rod to scratch the glass, which would make small shards of glass that would induce crystallization.  (Trial Tr.176:10-177:4.)  Instead, only after crystals formed in his product (just as they formed in Example 1), Dr. Adlington used a clean spatula to gently poke and swirl the resulting oil until it dissolved.  (Trial Tr.173:2-176:9 (referencing D.E. #195 at 29); D.E. 603 at 9 (steps 24-25).)  Dr. McBride admitted that he knew of no evidence that such scratching or poking would have any influence over the polymorphic form of bupropion hydrobromide.  (Trial Tr. 646:2-13.)[28]

- The amount of ingredients used by Dr. Adlington that were not specified in the Mehta '706 patent did not affect the chemistry of the bupropion hydrobromide product he synthesized.  Dr. Adlington testified that the Mehta '706 patent did not precisely explain every step that was required for the synthesis, but a person of ordinary skill would know how to fill in these gaps to synthesize a pure product.[29]  (Trial Tr. 168:18-170:15.)  For example, Valeant questioned Dr. Adlington at trial about the amount of charcoal (an ingredient used to purify compounds) he

---

[28]   Valeant's claim that Dr. Adlington "changed his testimony" about this step is wrong.  At trial Dr. Adlington merely explained the scratching step clearly showed that crystals had already formed.  (D.E. #603 at 9 (step 24); D.E. #195 at 29.)  Just because Dr. McBride may have overlooked this when he claimed that Dr. Adlington scratched to induce crystallization does not undermine Dr. Adlington's testimony.

[29]   Persons of skill in the art are allowed to rely on their general knowledge, and even other publically available references, to interpret teachings in the anticipatory reference.  In re Samour, 571 F.2d 559, 562-63 (C.C.P.A. 1978).

used, an amount that was not specified in Example 1 or questioned in Dr. McBride's expert report.[30]  (Trial Tr. 154:10-155:7 & 158:13-159:9; see also D.E. #603 at 6.)  Dr. Adlington confirmed that the amount he used did not affect the purity of his product.  (D.E. #603 at 7 (step 14); Trial Tr. 177:9-23.)

At the completion of his synthesis, Dr. Adlington concluded that he faithfully replicated the teachings of the Mehta '706 patent to synthesize bupropion hydrobromide.  (Trial Tr. 177:9-23.)  Dr. McBride also testified that Dr. Adlington faithfully followed the synthetic method taught by Mehta.  (Trial Tr. 682:12-21.)  There simply is no evidence to the contrary.

### 4. Form I inevitably resulted when the prior art was practiced to synthesize bupropion hydrobromide.

Dr. Glazer determined that both samples synthesized by Dr. Adlington resulted in Form I as claimed in Valeant's '992 patent.  Dr. Glazer tested both samples of bupropion hydrobromide synthesized by Dr. Adlington using PXRD analysis.  Dr. Glazer testified (and Valeant does not dispute)[31] that both samples resulted in Form I as claimed in Valeant's '992 patent.  (D.E. #604 at 16-21.)  This proves that, when one of ordinary skill follows the teachings of the Mehta '706 patent, Form I invariably is the result, and the '992 patent is therefore inherently anticipated.

---

[30]  Dr. McBride raised new criticisms about the amounts of certain ingredients used that he did not include in his report in violation of Fed. R. Civ. P. 26(a)(2)(B)(i).  No evidence supports these criticisms, and each should be stricken from the record.  Valeant's argument that seeds of Form I already could have been present in Dr. Adlington's lab also was a new argument that should be disregarded.  (D.I. 138-1 at 4.)  Valeant had no evidence to support that seeds of Form I may already have been present in Dr. Adlington's lab.  In fact, the evidence is the opposite—Dr. Adlington testified that he did not have seeds when he synthesized bupropion hydrobromide.  (Trial Tr. 171:7-13.)

[31]  Valeant's expert Dr. McBride testified that he agrees with Dr. Glazer that the bupropion hydrobromide synthesized by Dr. Adlington resulted in Form I as recited in claim 1 of the '992 patent.  (Trial Tr. 639:6-12.)

**B.      Valeant's Own Documents Show that Dr. Adlington's Synthesis Would Not Affect the Crystalline Form that Was Synthesized by Dr. Adlington.**

Valeant's documents prove that the steps Dr. Adlington followed in his synthesis of bupropion hydrobromide would not have affected the crystalline structure of bupropion hydrobromide.

Valeant's  U.S. Patent Application 2010-0068270 ("'270 Application) (D.E. #182) confirms that Form I[32] is the result of using the solvents used in Example 1 of the Mehta '706 patent.[33]  In each example of polymorph screening in this reference, the screens began with Form I and attempted to alter the crystal structure using a variety of solvents and crystallization conditions. (D.E. #604 at 20; Trial Tr. 256:14-258:1.)

Every time either water or isopropyl alcohol is used as solvents (the same solvents used in Example 1 of the Mehta '706 patent) in these screens, irrespective of the conditions, Form I results.  This is true when re-crystallization occurs at room temperature (Trial Tr. 258:2-21), at high temperature (Trial Tr. 259:11-21), and at low pressure.  (Trial Tr. 259:22-260:5.)  Notably, Form I also occurs at low temperature, the conditions used in Example 1 of the Mehta '706

---

[32]   Valeant's documents show there is no difference in the properties of all three crystalline forms of bupropion hydrobromide disclosed in Valeant's '992 patent.  Dr. McBride admitted that Chemi (Valeant's bupropion hydrobromide supplier) reported that all three forms have comparable physical and chemical stability, as well as comparable solubility.  (Trial Tr. 687:19-693:19; D.E. #296 at WATSON-BUP032257-63.)  Thus, Valeant failed to show that unpredictability in determining polymorphic forms or their properties had any affect on the crystalline form that resulted from Dr. Adlington's synthesis.  Dr. McBride also could point to no evidence of disappearing polymorphs with respect to bupropion.  (Trial Tr. 686:18-22, 686:23-687:4.)

[33]   The '270 Application is Valeant's later-filed patent application describing crystalline forms of bupropion hydrobromide (Forms I-VII), and includes numerous screens for crystal structures.  The '992 patent also contains screens for crystal structures of bupropion hydrobromide.  For example, Table 80 of the '992 patent is identical to Table 39 of the '270 Application.  (Compare D.E. #001 at col.181 ll. 40-65 with D.E. #182 at 93.)

patent.  (Trial Tr. 258:22-259:10; D.E. #135 col.4 ll.45-52.)[34]  Thus, the scientific evidence of record shows that, when bupropion hydrobromide is crystallized from either water or isopropyl alcohol as taught by the Mehta '706 patent, the crystal structure of Form I is the inevitable result.[35]  Therefore, claim 1 of Valeant's '992 patent, which claims Form I of bupropion hydrobromide, is inherently anticipated by the Mehta '706 patent.

## V.    CONCLUSION.

For the foregoing reasons, the Watson Defendants respectfully request that the Court find the asserted claims invalid.

---

[34]  Valeant argues that there is no indication in the '270 Application of what form results when isopropyl alcohol and ethanol are used together as they were used in the Mehta '706 patent.  (D.I. 120 at 1.)  But this ignores the fact that Form I is shown to result every time that water, the solvent used in the first crystallization in the Mehta '706 patent.  It also ignores the fact that Form I results every time isopropyl alcohol is used as the solvent, even when isopropyl alcohol is mixed with other solvents.

[35]  Of course, it would have been simple to disprove this evidence by showing a single instance where Form I did not result, but Valeant failed to present even one exception.

Dated:  July 29, 2011.                                    Respectfully submitted,


                                                          By:   s/Janet T. Munn
                                                          Janet T. Munn
                                                          Email: jmunn@rascoklock.com
                                                          Florida Bar No. 501281
                                                          *RASCO KLOCK, et al.*
                                                          283 Catalonia Avenue
                                                          Suite 200
                                                          Coral Gables, FL  33134
                                                          Telephone: 305.476.7101
                                                          Facsimile: 305.476.7102

                                                          AND

                                                          By:   s/John L. North
                                                          John L. North, Esq.
                                                          *(admitted pro hac vice)*
                                                          Email: jnorth@kasowitz.com
                                                          Jeffrey J. Toney, Esq.
                                                          *(admitted pro hac vice)*
                                                          Email:  jtoney@kasowitz.com
                                                          Darcy L. Jones, Esq.
                                                          *(admitted pro hac vice)*
                                                          Email: djones@kasowitz.com
                                                          Meghan M. Rachford, Esq.
                                                          *(admitted pro hac vice)*
                                                          Email: mrachford@kasowitz.com
                                                          Kasowitz, Benson, Torres &
                                                          Friedman LLP
                                                          1360 Peachtree Street, N.E.,
                                                          Suite 1150
                                                          Atlanta, GA  30309
                                                          Telephone:  404.260.6105
                                                          Facsimile: 404.260.6081

AND

Norman E.B. Minnear, Esq.
*(admitted pro hac vice)*
Email:  jminnear@kasowitz.com
Kasowitz, Benson, Torres &
Friedman LLP
1633 Broadway
New York, NY  10019
Telephone:  212.506.1742
Facsimile:  212.500.3563

*Attorneys for Defendants Watson*
*Pharmaceuticals, Inc.; Watson*
*Laboratories, Inc. – Florida and*
*Watson Pharma, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of July 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached service list in the manner specified, either via transmission of notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:_____s/Janet T. Munn_____
                   Janet T. Munn

-42-

SERVICE LIST

By: CM/ECF

Harley S. Tropin, Esq.
Email:  hst@kttlaw.com
Gail A. McQuilkin, Esq.
Email:  gam@kttlaw.com
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, FL  33134
Telephone: 305.372.1800
Facsimile: 305.372.3508

Theresa M. Gillis, Esq.
Email:  tgillis@mayerbrown.com
Mayer Brown LLP
1675 Broadway
New York, NY  10019
Telephone:  212.506.2553
Facsimile:  212.262.1910

Thomas W. Jenkins, Jr., Esq.
Email:  tjenkins@mayerbrown.com
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL  60606
Telephone:  312.701.7104
Facsimile:  312.701.7711